**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

-------------------------------------------------------x
ARIANE ROSE VILLARIN,            )
on behalf of herself and all others    )
similarly situated,               )
              Plaintiff,     )    Case No. _____
                      )    **CLASS AND COLLECTIVE**
   - v -               )    **ACTION COMPLAINT**
                      )
HEALTH CARE FACILITY      )
MANAGEMENT, LLC, d/b/a     )
COMMUNICARE FAMILY OF    )    (Jury Trial Demanded)
COMPANIES,               )
             Defendant.   )
-------------------------------------------------------x

      **PLAINTIFF** Ariane Rose Villarin ("Plaintiff"), by and through counsel, for her

Complaint against Defendant Health Care Facility Management, LLC, doing business as

CommuniCare Family of Companies ("Defendant" or "CommuniCare"), states and

alleges the following:

<u>**INTRODUCTION**</u>

      1.     Plaintiff brings this case as a "collective action" due to Defendant's failure

to pay her and other similarly-situated employees overtime compensation at the rate of

one and one-half times their regular rate of pay for all the hours they worked over 40

each workweek and for all hours worked in violation of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. §§ 201-219, as well as a "class action" pursuant to Fed. R. Civ. P.

23 to remedy violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §

1589 *et seq*., and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. § 1964.

1

2.     Upon information and belief, Defendant Health Care Facility Management, LLC, which does business as CommuniCare Family of Companies, is a labor recruiter and staffing company that hires registered nurses primarily from the Philippines to work in its healthcare facility-clients all over the United States.

3.     CommuniCare's "employment" is essentially indentured servitude. CommuniCare mandates that its workers not leave the company for thirty six (36) months unless they repay the company sixteen thousands dollars ($16,000) it allegedly expended related to each nurse's "immigration, including certain filing fees, recruitment/agency fees, legal costs and temporary housing". The company follows through on its threats by suing workers who dare to leave. Although CommuniCare knows its workers work overtime because of the lack of sufficient nursing staff in its healthcare facility-clients, it does not pay all of those overtime hours, especially meal periods and off-the-clock hours that its registered nurse-employees utilize to continue working and taking care of patients.

4.     CommuniCare maintains its scheme of obtaining foreign labor through fraud. It defrauds the United States government which approves the company's immigrant visa petitions without knowing that it routinely fails to pay its workers the prevailing wage it promises. It defrauds the workers themselves who arrive in the United States and find themselves subjected not only to unexpectedly harsh employment terms and unsafe workplace conditions, but also to several weeks of unpaid employment, contrary to Defendant's attestations that its immigration-sponsored employees will immediately be put on payroll upon their entrance into the United States.

5.     On behalf of herself and all similarly-situated healthcare workers who have been employed by Defendant during the relevant statutes of limitations, Plaintiff

seeks a judgment against Defendant for: (a) compensatory and liquidated damages for violations of the FLSA; (b) for compensatory and punitive damages for violations of the TVPA; (c) for treble compensatory and punitive damages for violations of the RICO ; (d) a declaration that the Repayment Provision is unenforceable under the TVPA, the FLSA, and Ohio law; (e) an award of reasonable attorney's fees and costs as authorized by the FLSA, the TVPA and RICO; and (f) such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) because this matter arises under the laws of the United States – specifically, the FLSA, TVPA and RICO.

7.    This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a).

8.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal law claims.

9.    This Court has personal jurisdiction over Defendant, and venue is proper in this Court, because Defendant's headquarters are within the Southern District of Ohio.

## PARTIES

10.    Plaintiff Ariane Rose Villarin is a Registered Nurse who was formerly employed by Defendant. She is a citizen of the Republic of the Philippines and a legal permanent resident of the United States. She lives in the state of Texas.

11.    Defendant HealthCare Facility Management LLC, doing business as CommuniCare Family of Companies is, upon information and belief, a limited liability

company organized under the laws of the State of Ohio with a principal place of business in Hamilton County, Ohio.

12.     At all relevant times, Plaintiff was an employee within the meaning of 29 U.S.C. § 203(e).

13.     At all relevant times, Defendant was an employer within the meaning of 29 U.S.C. § 203(d).

14.     At all relevant times, Defendant was an enterprise within the meaning of 29 U.S.C. § 203(r).

15.     At all relevant times, Defendant was an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(1).

16.     At all times relevant herein, Defendant performed related activities through unified operation and common control for a common business purpose, and thus operated as a single enterprise within the meaning of 29 U.S.C. § 203(r)(1).

17.     At all relevant times, Plaintiff was an employee engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 206-207.

18.     Plaintiff will file written consents to join this action as to the First Cause of Action pursuant to 29 U.S.C. § 216(b) when other individual plaintiffs execute them.

**FACTUAL ALLEGATIONS**

**A. CommuniCare's Recruitment of Foreign-Trained Registered Nurses**

19.     Defendant CommuniCare recruits trained nurses from the Philippines and elsewhere, petitioning them through the immigrant visa sponsorship process, bringing them to the United States, and selling their labor to healthcare facility-clients.

20.     CommuniCare profits by charging healthcare facility-clients more for healthcare workers' labor than it pays the workers in wages and benefits. Therefore, the longer CommuniCare can make healthcare workers continue to work for it, the more it can profit from their labor.

21.     CommuniCare recruits foreign registered nurses with the help of a separate corporate entity, Worldwide HealthStaff Solutions, Ltd. ("Worldwide HealthStaff").

22.     Upon information and belief, Worldwide HealthStaff is a company organized and existing under the laws of the state of North Carolina, and maintains offices in the Philippines, including in Manila.

23.     Defendant CommuniCare and Worldwide HealthStaff are distinct corporate entities.

24.     They play different roles within the recruitment process. Worldwide HealthStaff is principally responsible for recruiting healthcare workers when they are in the Philippines. Worldwide HealthStaff does not itself employ healthcare workers. Instead, CommuniCare employs the registered nurses that Worldwide HealthStaff recruited in the Philippines.

25.     CommuniCare uses Worldwide HealthStaff for its recruitment activities because Worldwide HealthStaff, upon information and belief, is licensed to conduct recruitment activities by the Philippine Overseas Employment Administration ("POEA") or is affiliated with a Philippine agency accredited by the POEA.

26.     Through Worldwide HealthStaff, Defendant CommuniCare recruits and enters into form contracts with international healthcare workers.

27.     CommuniCare's form contract has remained substantially the same for years.

28.     Under CommuniCare's form contract, CommuniCare assigns foreign-sponsored registered nurses to healthcare facilities that have entered into agreements to pay CommuniCare for the workers' labor.

**B. Relevant Foreign Labor Certification Process**

29.     Employers sponsoring green card workers to be employed in healthcare occupations under the EB-2 and EB-3 visa categories must make various attestations to the federal government to obtain those workers.

30.     EB-2 and EB-3 visas are employment-based green cards for foreign nationals who perform work not of a temporary or seasonal nature for which qualified workers are not available in the United States.

31.     In obtaining the required Department of Labor ("DOL") employment certification to obtain an EB-2 or EB-3 green card visa, an employer must typically complete and sign Form ETA 9089 and obtain DOL certification that there are no U.S. workers able, willing and qualified to do the job before then petitioning the United States Citizenship and Immigration Services ("USCIS") to seek such a visa.

32.     For certain occupations, DOL has predetermined there are insufficient U.S. workers who are able, willing and qualified. These occupations are referred to as Schedule A occupations and include registered nurses and physical therapists.

33.     Thus, when petitioning for green card visas for workers in Schedule A occupations, employer-petitioners file the Form I-140 Immigrant Petition for Alien Workers and the Form ETA 9089 directly with the USCIS.

34.     As part of the Form ETA 9089 filing, the employer must attest that the employer will pay at least the prevailing wage which is determined by the DOL based on the "average wage paid to similarly employed workers in a specific occupation in the area of intended employment." The purpose of the prevailing wage requirement is to ensure that the hiring of a foreign worker will not adversely affect the wages and working conditions of U.S. workers comparably employed.

35.     The employer must also attest that the employer will be able to place the green card worker on payroll on or before the date of proposed entry into the United States.

36.     The employer must certify that the job opportunity's terms, conditions and occupational environment are not contrary to federal, state, or local law.

37.     Additionally, when petitioning for a green card visa for Schedule A occupations, a petitioner attests that the job opportunity involves full-time and permanent employment, meaning that it will employ the beneficiary full-time, guarantee a full-time wage, and pay the beneficiary that wage.

**C. Plaintiff's Immigration Sponsorship by CommuniCare**

38.     At all times relevant, Plaintiff was an immigrant worker sponsored by CommuniCare under federal immigration law and regulations.

39.     On or about February 23, 2021, CommuniCare extended a conditional offer of employment to Plaintiff whereby Plaintiff was to render services as a Registered Nurse at an initial base pay rate of thirty two dollars and fifty cents ($32.50) per hour. CommuniCare required Plaintiff to sign the nonnegotiable form letter-contract that

included four pages of legalese in English that Plaintiff did not fully understand. CommuniCare presented the letter-contract to Plaintiff on a take-it-or-leave-it basis.

40.    Plaintiff had to sign the February 23, 2021 letter-contract if she wanted to come and work in the United States.

41.    At the time Plaintiff signed the February 23, 2021 letter-contract, she believed she would not be able to come to the United States if she did not sign it, because CommuniCare presented the letter-contract as a condition of sponsoring her immigrant visa petition.

42.    Upon information and belief, CommuniCare, on or about April 27, 2021, filed a Form I-140 immigrant worker petition with the USCIS on behalf of Plaintiff so that Plaintiff could come and work in the United States. The immigrant petition bore case number LIN-21-205-51107.

43.    Prior to submitting its Form I-140 petition on behalf of Plaintiff, CommuniCare had required Plaintiff to certify the truthfulness of her educational and employment credentials as a registered nurse. CommuniCare had required Plaintiff to make such declaration on the Form ETA 9089 application for permanent employment certification, which it submitted as part of the Form I-140 petition packet with the USCIS.

44.    CommuniCare gave Plaintiff a copy of the Form ETA 9089 to review and sign. In so doing, CommuniCare represented to Plaintiff that pursuant to the same Form ETA 9089, it was certifying that it would be able "to place the alien (that is, Plaintiff) on the payroll on or before the date of the alien's proposed entrance into the United States" and that "the job opportunity's terms, conditions, and occupational environment are not contrary to Federal, state or local law".

45.     Upon information and belief, the USCIS approved CommuniCare's I-140 immigrant petition on behalf of Plaintiff on or about April 28, 2021.

46.     As a result of the approval of CommuniCare's I-140 petition on behalf of Plaintiff, the U.S. Embassy in Manila, Philippines scheduled Plaintiff for her consular visa interview on April 18, 2022.

47.     Prior to Plaintiff's consular visa interview, CommuniCare sent Plaintiff a letter dated March 21, 2022 confirming its offer of employment and informing Plaintiff that she would be assigned at the Green Park Senior Living Community in St. Louis, MO.

48.     On June 3, 2022, CommuniCare's onboarding coordinator notified Plaintiff that she could arrive in the United States in mid-July 2022.

49.     As CommuniCare's agent, Worldwide HealthStaff facilitated and assisted Plaintiff regarding her ticketing and travel itineraries from the Philippines to the United States.

50.     Plaintiff arrived in the United States with an immigrant visa on July 19, 2022. She was picked up at the airport by CommuniCare's agents and was booked at a hotel near the healthcare facility she was supposed to work at.

**D. Communicare's Letter-Contract of Employment with a Repayment Provision**

51.     On or about July 1, 2022, CommuniCare sent Plaintiff another letter similar to the March 21, 2022 letter that confirmed its offer of employment to Plaintiff. As before, CommuniCare presented Plaintiff the non-negotiable July 1, 2022 letter-contract on a take-it-or-leave-it basis, and required Plaintiff to affix her electronic signature to the same.

52.     Pursuant to the July 1, 2022 letter-contract, Plaintiff's work-assignment would be at the Green Park Senior Living Community in St. Louis, MO, and that her base pay rate was thirty two dollars and fifty cents ($32.50) per hour.

53.     Pursuant to the July 1, 2022 letter-contract, all new employees "must attend an orientation program during the first week of employment". Plaintiff understood this to mean that CommuniCare would conduct her orientation on her first week of actual employment.

54.     As drafted by Defendant, the July 1, 2022 letter-contract provided that CommuniCare allegedly intended "to make advance payments in the amount of approximately $16,000 USD" on Plaintiff's behalf "for expenses related to immigration, including certain filing fees, recruitment/agency fees, legal costs and temporary housing". "Such expenses are considered advancements eligible to be forgiven over a period of" "thirty-six (36) months, at a rate of 1/36th for each month of service at CommuniCare" ("Repayment Provision").

55.     Pursuant to the July 1, 2022 letter-contract, if Plaintiff fails to repay the advance payments of approximately $16,000 USD at the time of termination, CommuniCare may pursue restitution through legal channels.

56.     Plaintiff electronically signed the July 1, 2022 letter-contract because she feared that if she did not, CommuniCare would withdraw its immigration sponsorship, revoke her green card, and/or not give her the promised job, which she had been waiting for so long.

**E. Conditions of Plaintiff's Employment with CommuniCare**

57.     Prior to Plaintiff signing the July 1, 2022 letter-contract, CommuniCare told Plaintiff that, once placed in a facility, she would be assigned a manageable patient case load.

58.     From her arrival date on July 19, 2022, Plaintiff was able, ready and willing to render her nursing services for CommuniCare or CommuniCare's healthcare facility-clients.

59.     CommuniCare did not provide Plaintiff any actual work assignment until sometime during the last week of September 2022. CommuniCare did not put Plaintiff on its payroll upon Plaintiff's entry into the United States.

60.     It was not until September 26, 2022 that CommuniCare provided Plaintiff with an actual work-assignment and required her to report to the Green Park Senior Living Community in St. Louis, MO for her supposed orientation.

61.     On her first day at work, Plaintiff was given a three-hour orientation of administrative policies and procedures by the facility's Human Resources Manager. She was, however, not given proper orientation on clinical policies and procedures, especially on the PCC System used in charting and documenting patient conditions and progress. She was not given any orientation skills checklist.

62.     On her first day at work, and without proper full orientation, Plaintiff was immediately assigned to the facility's Alzheimer's Unit, and then to the Long Term Care Unit, just because there were not enough nursing personnel to take care of the patients.

63.     At all times relevant, Plaintiff typically worked the 7 A.M. to 7 P.M. shift, seven days on any two-week period.

64. On most days, Plaintiff was assigned to be the charge nurse taking care on average between thirty six (36) and thirty nine (39) long-term care patients. To put this into perspective, if the Plaintiff worked nonstop without any break or pause for any reason during the entire 12-hour shift, this would give her about 18 minutes per patient.

65. The facility where CommuniCare assigned Plaintiff to work also failed to adequately staff nursing assistants, which meant that Plaintiff was not only doing the work of two nurses, but was also performing duties that would typically be the responsibility of assistants, such as sanitary cleaning, hygiene care, and feeding assistance for residents unable to feed themselves.

66. At work, Plaintiff was required to work under dangerous and unsafe conditions, sometimes caring for as many as forty (40) patients at a time. This patient load meant that Plaintiff rarely took a break and ran constantly from one patient to the next, unable to take the time she believed was necessary to provide patients with adequate care.

67. The lack of proper orientation and job training, coupled with the unreasonable daily RN-patient ratio, made Plaintiff distressed and anxious about the safety and health of her patients and the maintenance of her nursing license. Plaintiff believed that the daily unsafe work conditions and environment jeopardized her license and the lives of her patients.

68. On the rare occasions Plaintiff was able to take breaks, they rarely lasted longer than 10 – 15 minutes due to the severe staffing shortages and excessive number of patients in her care.

69.     At all times relevant, Plaintiff typically reported earlier than the start of her work-shift and extended her hours beyond the end of her work-shift to be able to accept or to endorse turn-over of care from the previous or to the incoming nurse on duty.

70.     Plaintiff's breakneck work pace was not only dangerous and exhausting for her, it also endangered her patients. Despite her best efforts, with only about 18 minutes per patient during her shift, she often could not physically get to patients fast enough to give them their medications on time, or to protect them against falls. Plaintiff commonly heard her patients moaning in agony as they waited for her or anyone else to provide them with care. Patients being fed often had to wait hours to eat because Plaintiff did not have the capacity to assist them. Patients frantically used their call buttons and rang them repeatedly, to alert staff of their medical needs, including issues like pain, G-tube feeding, wet diapers, and falls.

71.     As a result of the dangerous and unsafe staffing practices, Plaintiff suffered from anxiety and stress and feared something wrong might happen during her work-shift that would lead to the loss of her nursing license, or worse, to the death of a patient.

**F. CommuniCare's Failure to Pay All Compensable Hours**

72.     At all times relevant, CommuniCare employed Plaintiff as a Registered Nurse.

73.     CommuniCare employed, and continues to employ, other similarly-situated healthcare employees as registered nurses, nursing assistants and/or aides.

74.     CommuniCare employed Plaintiff and other similarly-situated healthcare workers as non-exempt employees under the FLSA.

75. CommuniCare paid Plaintiff and other similarly-situated healthcare employees an hourly wage.

76. Plaintiff's and other similarly-situated employees' pay was subject to a meal period deduction even when they performed compensable work during their meal periods.

77. CommuniCare's meal period deduction policy is centrally and collectively dictated, controlled and ratified.

78. Under the meal period deduction policy, CommuniCare required Plaintiff and similarly-situated employees to clock out for a 30-minute meal period per work shift.

79. Plaintiff and similarly-situated employees performed compensable work for CommuniCare during their uncompensated meal periods.

80. CommuniCare did not ensure that Plaintiff and similarly-situated employees were completely relieved of their work duties during their uncompensated meal periods.

81. Plaintiff and similarly-situated employees were routinely not completely relieved of their job duties during their uncompensated meal periods.

82. CommuniCare did not prohibit Plaintiff and similarly-situated employees from working during their meal periods and routinely suffered or permitted them to perform such work.

83. CommuniCare routinely failed to ensure that unauthorized work was not being performed during employee meal periods.

84. In fact, although CommuniCare deducted 30-minute meal periods, CommuniCare expected Plaintiff and similarly-situated employees to be available to

work throughout their shifts and consistently required its employees to work during unpaid meal periods.

85.     Plaintiff and similarly-situated employees were expected to eat without any change in demands from patients/residents or relief by additional staff.

86.     CommuniCare often required Plaintiff and similarly-situated employees to respond to requests by patients/residents, co-workers, and supervisors, during unpaid meal periods.

87.     CommuniCare knew and/or had reason to believe that Plaintiff and similarly-situated employees performed work during their unpaid meal periods.

88.     CommuniCare discouraged employees from reporting missed meal periods because it did not want to pay employees for missed meal periods.

89.     CommuniCare has observed Plaintiff and similarly-situated employees working through their unpaid meal periods.

90.     Given its client-facilities' industry's demands and staffing shortages, CommuniCare knew that to get the tasks done that they assigned to Plaintiff and similarly-situated employees, Plaintiff and similarly-situated employees had to work through their unpaid meal periods.

91.     Given its client-facilities' industry's demands and staffing shortages, CommuniCare knew that to get the tasks done that they assigned to Plaintiff and similarly-situated employees, Plaintiff and similarly-situated employees had to work even before the start of their work shifts, and had to extend their hours beyond the end of their work shifts to receive or make proper endorsement of care and/or to continue with patient care.

92.     Even though CommuniCare knew that Plaintiff and similarly-situated employees were working during "meal periods" and/or during "off-the-clock" hours, CommuniCare failed to compensate Plaintiff and similarly situated employees for their work, electing instead to sit back and accept the benefits of Plaintiff and similarly-situated employees' uncompensated work.

**G. CommuniCare's Failure to Pay Overtime Compensation**

93.     Plaintiff and other similarly-situated employees regularly worked over forty (40) hours per week. Plaintiff worked on average approximately 50 – 55 hours per workweek.

94.     As a result of Plaintiff and other similarly-situated employees not being paid for all hours worked, Plaintiff and other similarly-situated employees were not paid overtime compensation for all the hours they worked over 40 each workweek.

95.     CommuniCare knowingly and willfully engaged in the above-mentioned violations of the FLSA.

**H. CommuniCare's Misrepresentation Regarding Its Visa Petitions**

96.     In submitting Form I-140 petitions to obtain immigrant visas for Plaintiff and other foreign-sponsored registered nurses, CommuniCare attested that, among other things, (a) the terms and conditions of employment did not violate federal, state, or local law; (b) the job opportunity was for full-time, permanent employment, and; (c) that CommuniCare intended to pay the beneficiary the prevailing wage rates.

97.     CommuniCare knew that each of those attestations was false.

98.     First, CommuniCare knowingly misrepresented that the terms of its employment were consistent with federal, state, and local law. CommuniCare knew, for

example, that its Repayment Provision was not based on a real estimate of any actual damages it could sustain if the healthcare worker, including Plaintiff, left employment early. It therefore knew that its "repayment" provision was an illegal penalty provision.

99.     Second, CommuniCare misrepresented that it was petitioning for a job opportunity that was for full-time, permanent employment. CommuniCare knew that it was not offering full-time, permanent employment, but was instead offering employment contingent on the worker being placed with a CommuniCare client. It was not CommuniCare's intention to pay workers, including Plaintiff, for any periods in which they were not placed with and actively working for a CommuniCare facility-client. Instead, it intended to "bench" workers during periods in which they were not actively working for a CommuniCare facility-client.

100.    For example, it was always CommuniCare's intention to pay Plaintiff only when she was placed with a CommuniCare client and began working for that client. CommuniCare knew that would not happen until well after her entry into the United States. CommuniCare had notice well before Plaintiff's departure to the United States that she would arrive in mid-July 2022, and knew that she would not begin working for the facility until several weeks after.

101.    CommuniCare thus maintained the ability to "bench" Plaintiff and other healthcare workers, while telling USCIS it was doing no such thing. Its Repayment Provision allowed CommuniCare to maintain control over these workers and place them with clients when needed without fear that those workers would find employment elsewhere, even though CommuniCare would not be paying them before their placements and active assignments with CommuniCare facility-clients.

102.    Third, while CommuniCare attested in its filings that it would pay its employees, including Plaintiff, the prevailing wage rates, this was a misrepresentation. CommuniCare was not offering wage payments free and clear. Rather, CommuniCare intended to subject workers, including Plaintiff, to the threat of having to kickback those wages to cover CommuniCare's own business costs. In cases where CommuniCare collected penalties for early-departing healthcare workers, wages paid to those workers fell substantially below the promised prevailing wage. CommuniCare also knew that it was not going to pay prevailing wages during periods in which its workers were "benched" before their assignments.

103.    Furthermore, by intending to charge its own business expenses to its workers – including expenses related to the preparation of visa applications, insofar as those expenses were included in the Repayment Provision – CommuniCare misrepresented that it intended to pay those workers the prevailing wage.

104.    These misrepresentations caused harm to Plaintiff and other similarly-situated foreign-trained registered nurses employed by CommuniCare.

105.    Because USCIS requires payment at or above the prevailing wage, had it been aware that kickbacks to CommuniCare could be taken out of Plaintiff's offered salary, taking her far below the promised prevailing wages, it would have required payment of Plaintiff's wages free and clear, without threatened kickbacks to CommuniCare. Instead, Plaintiff was ultimately required to kickback thousands of dollars to CommuniCare for its ordinary business costs.

106.    Had CommuniCare disclosed its intention to bench and not pay healthcare workers before their assignments with CommuniCare clients, USCIS would have

18

required that CommuniCare pay Plaintiff and other similarly-situated healthcare workers for the entire period in which they were residing in the United States on CommuniCare-sponsored green card visas pursuant to CommuniCare's commitment to serve as a permanent and full-time employer.

107.    These misrepresentations were part of a pattern of misrepresentations made by Defendant to USCIS in potentially hundreds of visa petitions with the goal of obtaining green card workers, including Plaintiff.

### I. CommuniCare's Pattern and Practice of Threatening Serious Harm to Prevent Sponsored Registered Nurses from Leaving their Employ

108.    CommuniCare engaged in a deliberate scheme, pattern and plan intended to cause Plaintiff and other sponsored registered nurses to believe that they would suffer serious harm if they tried to leave the Defendant's employ or find other employment.

109.    CommuniCare's standard letter-contract of employment provides that an immigration-sponsored registered nurse cannot stop working until s/he either pays or works off a $16,000 indenture disguised as a "repayment" provision.

110.    The $16,000 indenture is designed to coerce the sponsored registered nurses into continuing their employment with the Defendant.

111.    The amount of $16,000 is disproportionate to the actual costs incurred by the Defendant.

112.    The $16,000 indenture is disproportionate to the compensation paid to the sponsored registered nurses.

113.    The purpose of the $16,000 indenture is not to compensate Defendant for actual damages.

114.    The purpose of the $16,000 indenture is to obtain and provide Plaintiff's labor and services to Defendant and its facility-clients.

115.    The purpose of the $16,000 indenture is to deter Plaintiff from leaving her employment with Defendant.

116.    Defendant CommuniCare was and is able to calculate the amount of actual damages it would suffer in the event an immigration-sponsored registered nurse breached the employment contract.

117.    Plaintiff reasonably feared that CommuniCare would sue her for the $16,000 indenture.

118.    The $16,000 indenture is part of a contract of adhesion that CommuniCare obtained as a result of unequal sophistication and bargaining power.

119.    Upon information and belief, CommuniCare has brought and threatened to bring baseless lawsuits against several foreign-sponsored registered nurses to induce all foreign-sponsored registered nurses to continue working for the Defendant.

120.    CommuniCare's baseless and abusive lawsuits against foreign-sponsored registered nurses are part of a longstanding pattern and practice designed to induce fear and prevent foreign-sponsored registered nurses from seeking other employment.

121.    Upon information and belief, CommuniCare's actual and threatened legal actions were pursued for the purpose of coercing other foreign-sponsored registered nurses to continue working for the Defendant.

122.    Upon information and belief, CommuniCare's actual and threatened legal actions were pursued with the intent to cause all foreign-sponsored registered nurses to

believe that they would suffer serious psychological, financial or reputational harm if they did not continue working for the Defendant.

123.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and other foreign-sponsored registered nurses continued working for the Defendant at hours that were not fully compensated.

**J. Plaintiff's Complaints and Eventual Resignation**

124.    On or about December 7, 2022, Plaintiff communicated and raised her complaints about lack of proper orientation and training and the lack of sufficient and safe nursing staffing to CommuniCare.

125.    Due to understaffing, Plaintiff would regularly be required to stay on and work for additional hours after working her scheduled 12-hour shifts.

126.    Due to understaffing, Plaintiff experienced not being able to utilize her rest days or sick leave benefits because she was required to report to work instead.

127.    Due to this understaffing, Plaintiff and other nurses working for CommuniCare were required to be responsible for an excessive number of patients/residents. The low nurse-to-patient ratio was dangerous for both the nurses and their patients.

128.    CommuniCare was aware of the understaffing issues but did nothing to correct the situation.

129.    Plaintiff's complaints and issues were never fully and satisfactorily addressed by either the facility or by CommuniCare.

130.    After weeks of exhausting work and persistent fear of losing her license, Plaintiff, on December 19, 2022, informed the facility's Director of Nursing and Human

Resources Manager and also CommuniCare's agents that she was resigning from her position as Registered Nurse and that her last day of work would be on January 2, 2023.

131.    Plaintiff wanted to leave CommuniCare's employ much earlier, especially after it became clear that the patient load and RN-patient ratio issues were not going to be addressed satisfactorily. However, she was unable to leave because of the severe financial penalty she would have to pay under her contract's Repayment Provision.

132.    Plaintiff's inability to leave CommuniCare caused her substantial distress. Many nights when she returned from work, Plaintiff cried. She felt desperate, helpless and depressed. She felt trapped and scared.

133.    Plaintiff was terrified to resign from her job but felt that her working conditions were extremely unsafe, dangerous and presented a genuine risk to her nursing license. If Plaintiff lost her license, she would end up even more helpless. Eventually, notwithstanding the substantial risks, she decided to resign from her job and hoped to save her mental health and her license.

134.    With no other option, Plaintiff borrowed money from relatives and friends to be able to raise the "repayment" penalty as stated in CommuniCare's letter-contract of employment.

135.    Plaintiff continues to suffer stress, anxiety, guilt and depression as a result of her decision to borrow a substantial amount of money she did not even know how to repay. She continues to face ongoing harm because of CommuniCare's ongoing threat to enforce the illegal "repayment provision" to which CommuniCare claims Plaintiff is bound.

136.    Much, if not all, of Plaintiff's "repayment" penalty was not meant to cover costs specifically associated with Plaintiff. To the contrary, it was merely additional income to CommuniCare, used by the company to cover its ordinary business expenses.

137.    Plaintiff's last full week working for Communicare was the week ending on January 7, 2023. During that week, Plaintiff worked twelve (12) hours, and based on her $41 hourly wage, earned approximately $492.00.

138.    Had Plaintiff actually made the "repayment" penalty of even $14,000, CommuniCare would have paid Plaintiff negative wages in her final workweek.

139.    Even if some of the "repayment" penalty was, in theory, meant to reimburse CommuniCare for costs incurred for Plaintiff's benefit, Plaintiff was still going to be paid below the minimum wage. This is because most of the "repayment" penalty was designed to, or did in fact, cover CommuniCare's expenses incurred for CommuniCare's benefit. For example, "expenses related to immigration including certain filing fees, recruitment/agency fees, [and] legal costs", are clearly CommuniCare's normal business operating expenses.

## **COLLECTIVE ACTION ALLEGATIONS**

140.    Plaintiff brings the First Cause of Action individually, pursuant to 29 U.S.C. § 216(b), and on behalf of all similarly-situated individuals who have been, are being, or will be, adversely affected by Defendant's unlawful conduct.

141.    The FLSA Collective that Plaintiff seeks to represent and for whom she seeks the right to send "opt-in" notices for purposes of the collective action, and of which Plaintiff herself is a member, is composed of and defined as follows:

> All non-exempt, hourly-paid healthcare workers currently and formerly employed by CommuniCare at any time in the three years preceding this action.

142. All of the work that Plaintiff and the FLSA Collective have performed has been assigned by CommuniCare, and/or CommuniCare has been aware of all of the work that Plaintiff and the FLSA Collective have performed.

143. As part of its regular business practice, CommuniCare has intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiff and the FLSA Collective. This policy and pattern or practice includes, but is not limited to:

a. willfully failing to pay Plaintiff and the members of the FLSA Collective wages for all of their hours worked, including during compensable meal periods and off-the-clock hours before and after their work shifts;

b. willfully failing to pay Plaintiff and the members of the FLSA Collective overtime wages for hours that they worked in excess of 40 hours per workweek;

c. willfully failing to record all of the time that its employees, including Plaintiff and the FLSA Collective, have worked for the benefit of CommuniCare.

144. Time sheets and/or pay stubs reflect some of the overtime hours Plaintiff and members of the FLSA Collective worked.

145. CommuniCare is aware or should have been aware that federal law required it to pay employees performing non-exempt duties, including Plaintiff and

members of the FLSA Collective, minimum wage for all hours worked, and an overtime premium for hours worked in excess of 40 per workweek.

146.    Plaintiff and the FLSA Collective all perform or performed the same primary nursing duty, and all were paid hourly wages by CommuniCare.

147.    CommuniCare's unlawful conduct has been widespread, repeated, and consistent.

148.    Plaintiff cannot currently state the potential Collective's exact size, but upon information and belief, avers that it consists of at least around 100 individuals.

149.    This action is maintainable as an "opt in" collective action pursuant to 29 U.S.C. § 216(b) as to claims for unpaid overtime compensation, unpaid minimum wages, liquidated damages, and attorney's fees and costs under the FLSA. In addition to Plaintiff, numerous current and former employees employed as healthcare workers are similarly situated with regard to their wages and claims for unpaid wages and damages. In bringing this action, Plaintiff is representing those other employees and their interests, as well as her own.

150.    These similarly situated employees are known to Defendant and are readily available through Defendant's payroll records. These individuals may readily be notified of this action and allowed to opt in pursuant to 29 U.S.C. 216(b) for the purpose of collectively adjudicating their claims for unpaid compensation, unpaid minimum wages, liquidated damages, and attorney's fees and costs under the FLSA.

## **CLASS ACTION ALLEGATIONS**

151.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

152.     Plaintiff asserts claims on behalf of and seeks to represent the following

Classes:

> **Foreign-Trained Registered Nurse Class:** All foreign-trained registered
> nurses sponsored by CommuniCare through the immigration process
> within the statute of limitations.

> **RN Visa Fraud Subclass:** All members of the Foreign-Trained
> Registered Nurse Class who, within the statute of limitations,
> CommuniCare did not pay during times after the worker had entered the
> United States when they were not assigned to a healthcare facility or were
> waiting for an assignment to begin.

> **RN Trafficking Subclass:** All members of the Foreign-Trained
> Registered Nurse Class who, within the statute of limitations, were
> required  by CommuniCare to sign contracts with a Repayment Provision.

153.     Plaintiff reserves the right to amend and refine the class definitions above

or add classes and/or subclasses as litigation progresses.

154.     Numerosity: The Classes are so numerous that joinder of all class

members is impracticable. Although the precise number of putative Class members is

currently unknown, Plaintiff believes that each Class includes more than forty (40)

members. These members can be identified based on Defendant's records, which would

include information on the employees' placement, length of employment, whether and

how much they were paid, and whether and how much they were required to pay in order

to leave Defendant's employ.

155.     Commonality: There are questions of law and fact common to Plaintiff

and the members of the Classes that predominate over any questions affecting only

individual members. These common questions of law and fact include:

a) Whether CommuniCare obtains the labor of foreign-trained registered nurses by using serious harm or threats of serious harm in violation of the TVPA;

b) Whether CommuniCare's uniform practices surrounding the Repayment Provision and conditions of work constitute attempted labor trafficking in violation of the TVPA;

c) Whether CommuniCare knowingly recruits foreign-trained registered nurses and knowingly benefits by its violations of the TVPA;

d) Whether Defendant is engaged in an enterprise with Worldwide HealthStaff and/or its facility-clients, through which CommuniCare conducts racketeering activity that involves fraud in foreign labor contracting and visa fraud;

e) Whether CommuniCare knowingly misrepresents that it will employ its healthcare workers in full-time permanent positions, when in fact it intends to "bench" those workers and not pay them during periods in which they are not on active assignment for one of CommuniCare's facility-clients;

f) The proper measure of damages; and

g) The proper measure of punitive damages.

156. These common questions arise, in part, because of the uniform circumstances under which Plaintiff and the Classes worked. These include the form contracts and workplace policies that resulted in a standard environment and set of

27

employer-mandated conditions that employees were forced to abide by under the same threat of being sued, suffering adverse immigration consequences, and facing financial harm.

157.    Typicality: Plaintiff's claims are typical of the members of the Classes for precisely the reasons set forth above. Among other things, Defendant uses a standard letter-contract of employment, and Plaintiff's contract with CommuniCare is typical of Defendant's form contracts. Further, CommuniCare treated Plaintiff consistently with other Class members, in accordance with its standard policies and practices. Plaintiff and members of the Classes sustained injuries and damages arising out of and proximately caused by the Defendant's policies and practices described above.

158.    Adequacy of Representation: Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff is committed to the prosecution of this action and has retained counsel competent and experienced in litigating employment class actions, including actions alleging violations of the FLSA and the TVPA. There are no conflicts between Plaintiff and the Classes she seeks to represent.

159.    Superiority: A class action is superior to other available means for fair and efficient adjudication of this controversy. Each Class member has been damaged and is entitled to recovery because of Defendant's illegal policies and practices. Individual joinder of all Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Class certification will obviate the need for unduly duplicative litigation that might result

in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

160. Common questions of law and fact also predominate as to Plaintiff's claim that Defendant attempted to obtain forced labor in violation of law. CommuniCare attempted to keep every foreign-trained registered nurse it sponsored in its employ through the threats of severe penalties and litigation, as well as through conditions of employment. That attempt – regardless of whether an employee could eventually pay the severe monetary penalty or the degree to which they were misled and forced to continue working against their will – was the same and uniformly made as to each and every sponsored employee.

161. Plaintiff intends to send notice to all members of the Classes to the extent required by Fed. R. Civ. P. 23(c)(2). The names and addresses of the Class members are available from Defendant's records.

### FIRST CAUSE OF ACTION
**Violations of the Fair Labor Standards Act – Overtime Wages**
**(Brought on behalf of Plaintiff and the FLSA Collective)**

162. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 18, in paragraphs 57 through 95, and in paragraphs 124 to 161, as if set forth fully herein.

163. CommuniCare has engaged in a widespread pattern and practice of violating the FLSA, as described in this Class and Collective Action Complaint.

164.   Plaintiff has consented in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b). Attached as Exhibit "A" is Plaintiff's Consent to be a Party Plaintiff.

165.   At all relevant times, CommuniCare has been an employer engaged in interstate commerce consistent with 29 U.S.C. §§ 206(a) and 207(a). At all times relevant, CommuniCare employed Plaintiff and the members of the Collective consistent with the terms of the FLSA.

166.   At all relevant times, upon information and belief, CommuniCare has had annual gross revenues in excess of $500,000.

167.   Upon information and belief, CommuniCare employs or employed more than four (4) workers who fall under the category of "non-exempt employees" pursuant to the FLSA, and these employees regularly and recurrently either engaged in commerce or handled or otherwise worked on goods or materials that had been moved in or produced for commerce, such as when they handled credit card transactions or when they accepted delivery of supplies ordered from out-of-state.

168.   Upon information and belief, at all times relevant, the wage and hour and all related employee compensation policies of CommuniCare are and were centrally and collectively dictated, controlled, and ratified by the Defendant.

169.   Defendant's practice and policy of not paying Plaintiff and other similarly situated employees for work performed during meal periods and during off-the-clock hours (before the start and after the end of each work shift) violated the FLSA, 29 U.S.C. § 207.

170.   Defendant's practice and policy of not paying Plaintiff and other similarly situated employees overtime compensation at the rate of one and one-half times their

regular rate of pay for the hours they worked over 40 each workweek violated the FLSA, 29 U.S.C. § 207.

171.    Defendant's failure to keep accurate records of all of the hours worked each workday and the total hours worked each workweek by Plaintiff and other similarly-situated employees violated the FLSA, 29 C.F.R. § 516.2(a)(7).

172.    CommuniCare's violations of the FLSA, as described in this Class and Collective Action Complaint, have been willful and intentional. CommuniCare has failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiff and other similarly-situated current and former employees.

173.    Because CommuniCare's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

174.    As a result of CommuniCare's willful violations of the FLSA, Plaintiff and all other similarly situated employees have suffered damages by being denied overtime wages in accordance with 29 U.S.C. §§ 201 *et seq*.

175.    As a result of the unlawful acts of CommuniCare, Plaintiff and other similarly situated current and former employees have been deprived of overtime compensation and other wages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorney's fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION**
**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1589(a)**
**(Brought on behalf of Plaintiff and the Foreign-Trained Registered Nurse Class)**

176. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 71, in paragraphs 96 through 139, and in paragraphs 151 to 161, as if set forth fully herein.

177. It is a violation of the TVPA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . ." 18 U.S.C. § 1589(a).

178. The TVPA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services to avoid incurring that harm." *Id.* § 1589(c)(2).

179. CommuniCare obtained the labor of Plaintiff and the Foreign-Trained Registered Nurse Class members through threats of serious harm, through a scheme to make Plaintiff and members of the Foreign-Trained Registered Nurse Class believe they would suffer serious harm, and through threatened abuse of legal process, through the terms and administration of its letter-contracts of employment with employees.

180. CommuniCare kept Plaintiff and the Class members working for it against their will with the contract's terms of indentured servitude, with an unenforceable monetary penalty masquerading as Repayment Provision, with threats of litigation, with contractual provisions that caused employees to fear withdrawal of immigration

sponsorship or revocation of green card or withholding of employment, and with otherwise draconian employment conditions, as described herein.

181.    The Repayment Provision is intended to achieve purposes that are illegal under the TVPA, as it aims to procure or maintain the labor or services of Plaintiff and the Class by threatening them that they will have to repay "expenses related to immigration, including certain filing fees, recruitment/agency fees, legal costs and temporary housing", if they leave their job.

182.    The letter-contracts of employment further provide that if the employee fails "to repay at the time of termination, CommuniCare may pursue restitution through legal channels".

183.    These threats constitute the "threatened abuse of legal process" and/or a threat of "serious harm", in violation of 18 U.S.C. § 1589(a)(2)-(3).

184.    Defendant knowingly used such threats to exert pressure on Plaintiff and the Class to continue working for Defendant and to prevent them from seeking employment elsewhere, telling them that they would be on the hook for immigration expenses, recruitment fees, and legal costs, unless they worked for at least 36 months. This was done with the purpose of obtaining Plaintiff's and the Class's continued labor for Defendant.

185.    CommuniCare' use of such means to obtain the labor of Plaintiff and the Class was knowing and intentional.

186.    Plaintiff and the Class suffered damages as a direct and proximate result of Defendant's conduct. These damages include, but are not limited to, emotional distress damages and the loss of proper and correct wage payments.

187.   Plaintiff and, upon information and belief, the members of the Class each suffered and continue to suffer emotional distress and financial distress due to Defendant's coercive and/or fraudulent tactics resulting in their forced labor and/or trafficking.

188.   The emotional effects Plaintiff and, upon information and belief, the Class members suffered and continue to suffer include disrupted sleeping, emotional breakdowns, nightmares, ongoing feelings of fear, difficulty developing trust, anxiety, depression, difficulty concentrating and stress.

189.   Plaintiff and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action.

### THIRD CAUSE OF ACTION
### Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1589(b)
### (Brought on behalf of Plaintiff and the Foreign-Trained Registered Nurse Class)

190.   Plaintiff realleges and incorporates by reference all allegations incorporated in and set forth in paragraphs 176 through 189 as if set forth fully herein.

191.   It is a violation of the TVPA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

192.   Defendant has knowingly benefited from its participation in the forced labor venture described herein by earning substantial profits from the venture.

193.   Defendant knew or recklessly disregarded the fact that the venture described herein engaged in obtaining forced labor.

194. Plaintiff and the Class suffered damages as a direct and proximate result of Defendant's conduct. These damages include, but are not limited to, emotional distress damages.

195. Plaintiff and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action.

<u>**FOURTH CAUSE OF ACTION**</u>
**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1590(a)**
**(Brought on behalf of Plaintiff and the Foreign-Trained Registered Nurse Class)**

196. Plaintiff realleges and incorporates by reference all allegations incorporated in and set forth in paragraphs 176 through 195 as if set forth fully herein.

197. It is a violation of the TVPA to "knowingly recruit[], . . . transport[], provide[] or obtain[] by any means, any person for labor or services in violation of" the TVPA.

198. Defendant knowingly and purposefully recruited Plaintiff and the Class members, as described herein, in violation of the TVPA.

199. Defendant knowingly and purposefully transported Plaintiff and the Class members, as described herein, in violation of the TVPA.

200. Defendant knowingly and purposefully provided the labor of Plaintiff and the Class members, as described herein, in violation of the TVPA.

201. Defendant knowingly and purposefully obtained the labor of Plaintiff and the Class members, as described herein, in violation of the TVPA.

202.    Plaintiff and the Class suffered damages as a direct and proximate result of Defendant's conduct. These damages include, but are not limited to, emotional distress damages.

203.    Plaintiff and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action.

**FIFTH CAUSE OF ACTION**
**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1594(a)**
**(Brought on behalf of Plaintiff and the Foreign-Trained Registered Nurse Class)**

204.    Plaintiff realleges and incorporates by reference all allegations incorporated in and set forth in paragraphs 176 through 203 as if set forth fully herein.

205.    Attempts to violate the TVPA are themselves violations of the TVPA. 18 U.S.C. § 1594(a).

206.    Defendant attempted to violate 18 U.S.C. §§ 1589 and 1590, as described herein.

207.    Plaintiff and the Class suffered damages as a direct and proximate result of Defendant's conduct. These damages include, but are not limited to, emotional distress damages.

208.    Plaintiff and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action.

**SIXTH CAUSE OF ACTION**
**Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962**
**(Fraud in Foreign Labor Contracting, 18 U.S.C. § 1351)**
**(Visa Fraud, 18 U.S.C. § 1546)**
**(Brought on behalf of Plaintiff and the RN Visa Fraud Subclass)**

36

209. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 71, in paragraphs 96 through 139, in paragraphs 151 to 161, and in paragraphs 176 through 208, as if set forth fully herein.

210. Defendant CommuniCare has engaged in the following knowing and material fraudulent representations to and concealments of material facts from registered nurses it sponsored with the intent to induce them to come to the United Sates, where they were ultimately indentured to Defendant under threat of serious harm and abuse of legal process.

211. Defendant knowingly misrepresents on its Form I-140 immigrant worker petitions that its terms of employment comply with state law, when in fact its purported "repayment" provision is an illegal penalty under state law because it is not an estimate of Defendant's damages. These misrepresentations constitute repeated instances of visa fraud in violation of 18 U.S.C. § 1546.

212. Defendant knowingly misrepresents on its Form I-140 immigrant worker petitions that it is seeking workers for full-time permanent employment when it knows that there are periods of time when those workers, such as Plaintiff and the Subclass members, will be "benched". These misrepresentations constitute repeated instances of visa fraud in violation of 18 U.S.C. § 1546.

213. Defendant knowingly misrepresents on its Form I-140 immigrant worker petitions that it pays its green card workers prevailing wage when in fact it does not offer or pay those wages free and clear because it seeks and recovers kickbacks from these workers to pay business expenses through its "repayment" provision and "benches" workers without pay.

214. Defendant failed to tell Plaintiff and the Subclass members that there may be periods when they were going to be without an assignment or waiting for an assignment to start and that they would not be paid for that "benching" time, instead communicating to them that they would be full-time and permanent employees.

215. Defendant's scheme to defraud relied upon multiple repeated uses of the wires, including through email, telephone, and Internet or fax transmissions of relevant visa petitions and paperwork. The scheme was reasonably calculated to deceive and defraud Plaintiff and the RN Visa Fraud Subclass.

216. These fraudulent representations and concealments of material facts constitute repeated acts of fraud in foreign labor contracting under 18 U.S.C. § 1351 and wire fraud under 18 U.S.C. § 1343 that Defendant engaged in as part of its activities conducting or conspiring to conduct the enterprise's affairs.

217. On its own, this conduct constitutes a pattern of racketeering activity. Alternatively, it constitutes a pattern of racketeering activity in conjunction with multiple acts indictable under 18 U.S.C. § 1351 (fraud in foreign labor contracting), 18 U.S.C. § 1546 (visa fraud), 18 U.S.C. § 1592 (unlawful conduct with respect to documents in furtherance of trafficking, involuntary servitude or forced labor), and 18 U.S.C. § 1590 (trafficking with respect to involuntary servitude or forced labor), contrary to 18 U.S.C. §§ 1962(c) and (d). The activities described above are part of that pattern.

218. The pattern is part of a related and continuous scheme of misconduct over the past several years designed to use lies to recruit inexpensive foreign worker to the United States and keep them trapped in their jobs with illegal contractual terms, workplace policies, and threats.

219.   Defendant CommuniCare repeatedly committed the RICO predicate acts of fraud and misuse of visas and other documents, mail and wire fraud, involuntary servitude, forced labor and trafficking. These predicate acts of criminal racketeering activity constitute a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5).

220.   The predicate acts are part of Defendant's regular way of doing business.

221.   The predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.  The predicate acts have the same or similar purpose: to profit and benefit from the fraudulent recruitment and forced labor of Plaintiff and other sponsored foreign-trained registered nurses.

222.   The predicate acts have yielded similar results and caused similar injuries to Plaintiff and, upon information and belief, to other foreign-trained registered nurses, including lost or unpaid wages and benefits, and the pain and suffering brought about by emotional stress and anxiety as a result of Defendant's continuing threat of abuse of the legal process. The predicate acts have resulted to Plaintiff's detrimental reliance of Defendant's misrepresentations as to the nature and terms of her employment in the United States. Contrary to her expectations, Plaintiff did not immediately become employed or given an assignment upon her entry into the United States, and consequently, did not receive the lawful wages and benefits she would have received had she been immediately given a full-time assignment upon her entry. Consequently, these acts of racketeering activity that constitute a pattern of racketeering activity have defrauded the Plaintiff and have enriched the Defendant at the Plaintiff's expense.

223. The predicate acts have similar participants: Defendant CommuniCare, Worldwide HealthStaff and the various healthcare facility-clients of CommuniCare.

224. The predicate acts have similar victims: Plaintiff and, upon information or belief, other foreign-trained registered nurses who were also recruited by Worldwide HealthStaff, sponsored by CommuniCare, later on transported, and provided for labor or services in CommuniCare's healthcare facility-clients.

225. The predicate acts have similar methods of commission, including comparable recruitment tactics, procedures for facilitating the immigration and visa processes, non-provision of employment upon entry of the sponsored registered nurse to the United States, and the provision to and eventual employment, forced labor, involuntary servitude and exploitative treatment of these foreign-trained registered nurses at CommuniCare' healthcare facility-clients.

226. Defendant CommuniCare and the distinct company Worldwide HealthStaff constitute a RICO "enterprise" as defined by 18 U.S.C. § 1961(4). In the alternative, these entities, together with CommuniCare's facility-clients, constitute such an enterprise. Defendant and Worldwide HealthStaff have for several years maintained an ongoing relationship. Through the relationship, Worldwide HealthStaff recruited foreign-trained registered nurses and connected them to Defendant. Defendant then petitioned or applied for those workers' visas and employed them once they came to the United States. Worldwide HealthStaff communicates with healthcare workers in the Philippines as they have questions about the recruitment and employment process; it serves as the go-between for CommuniCare and the healthcare workers in terms of coordinating travel,

arrival dates, necessary paperwork, and preparing for embassy interviews; and it keeps CommuniCare informed on visa paperwork and processing status.

227.    Throughout this period, these entities have maintained the common purpose of recruiting, providing, processing, and obtaining inexpensive foreign-trained registered nurses to perform work in the United States.

228.    Those entities, along with CommuniCare's healthcare facility-clients all over the United States, have also maintained an ongoing relationship for several years under which Worldwide HealthStaff has recruited foreign-trained registered nurses and connected them to Defendant CommuniCare. Defendant petitioned or applied for those workers' visas and employed them once in the United States, placing them at healthcare facilities owned and operated by CommuniCare or its clients. Throughout this period, those entities have maintained the common purpose of recruiting inexpensive foreign-trained registered nurses to perform work in the United States.

229.    The enterprise is engaged in interstate commerce in that its activities and transactions relating to the international and interstate movement of workers affect interstate commerce and frequently require travel and communications across state and international lines.

230.    Defendant has conducted or participated directly in the enterprise's affairs. Defendant has been directly engaged in the racketeering activity alleged here, including by providing material misrepresentations to the government regarding the employment of foreign-trained registered nurses, making material misrepresentations to these healthcare workers before they entered the United States, and maintaining policies designed to force those workers to continue working for it under threats of substantial harm. Defendant

engaged in these activities to further the enterprise's purpose of recruiting and importing into the United States inexpensive foreign-trained registered nurses to work in its healthcare facilities/clients.

231.    Defendant has used the enterprise and the existence of distinct corporate entities within the enterprise to engage in the alleged racketeering activity.

232.    The fraudulent representations and concealments of material facts described above caused Plaintiff and the members of the RN Visa Fraud Subclass to experience harm to business or property in the form of expenses related to moving to the United States without pay that they otherwise would not have incurred, as well as reduced wages and/or lost and unpaid wages and benefits and lost employment opportunities. Thus, Plaintiff and the Subclass members are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

233.    Plaintiff and the members of the RN Visa Fraud Subclass are entitled to an award of damages in an amount to be determined, including treble damages, attorney's fees, and costs associated with this action.

**SEVENTH CAUSE OF ACTION**
**Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962**
**(Forced Labor and Trafficking, 18 U.S.C. §§ 1589 and 1590)**
**(Brought on behalf of Plaintiff and the RN Trafficking Subclass)**

234.    Plaintiff realleges and incorporates by reference all allegations incorporated in and set forth in paragraphs 209 through 233 as if set forth fully herein.

235.    For the reasons described above, Defendant CommuniCare engages in multiple repeated violations of trafficking and attempted trafficking with respect to involuntary servitude or forced labor in violation of 18 U.S.C. § 1590. Defendant engages in that conduct as part of its activities conducting or conspiring to operate the affairs of

the enterprise with the goal of furthering the enterprise's purposes of obtaining and supplying inexpensive foreign-trained registered nurses to United States healthcare facilities.

236.    On its own, this conduct constitutes a pattern of racketeering activity. Alternatively, it constitutes a pattern of racketeering activity in conjunction with multiple acts indictable under 18 U.S.C. § 1351 (fraud in foreign labor contracting), 18 U.S.C. § 1546 (visa fraud), 18 U.S.C. § 1592 (unlawful conduct with respect to documents in furtherance of trafficking, involuntary servitude or forced labor), and 18 U.S.C. § 1590 (trafficking with respect to involuntary servitude or forced labor), contrary to 18 U.S.C. §§ 1962(c) and (d). The activities described above are part of that pattern.

237.    The pattern is part of a related and continuous scheme of misconduct over the past several years designed to use lies to recruit inexpensive foreign worker to the United States and keep them trapped in their jobs with illegal contractual terms, workplace policies, and threats.

238.    Defendant CommuniCare and the distinct company Worldwide HealthStaff constitute a RICO "enterprise" as defined by 18 U.S.C. § 1961(4). In the alternative, these entities, together with CommuniCare's facility-clients, constitute such an enterprise. Defendant is a "person" as defined by RICO, 18 U.S.C. § 1961(3).

239.    Plaintiff and the members of the RN Trafficking Subclass are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c). Related to these violations, Plaintiff and the Subclass members experienced injury to business or property in the form of unpaid wages, reduced wages, payments of expenses related to coming to the United States, lost and unpaid wages and benefits and lost employment opportunities.

240. Plaintiff and the members of the RN Trafficking Subclass are entitled to an award of damages in an amount to be determined, including treble damages, attorney's fees, and costs associated with this action.

## EIGHTH CAUSE OF ACTION
### Breach of Contract

241. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 18, in paragraphs 38 through 95, and in paragraphs 124 through 139, as if set forth fully herein.

242. Plaintiff entered into a letter-contract with Defendant regarding her employment on or about July 1, 2022. A copy of the contract is attached as Exhibit "B".

243. The letter-contract provided that Defendant would pay Plaintiff an hourly pay for her services as a Registered Nurse.

244. Plaintiff substantially performed under the letter-contract of employment.

245. Defendant breached the letter-contract of employment by failing to pay Plaintiff for all of her hours of work.

246. Defendant breached the letter-contract of employment by failing to provide Plaintiff with an appropriate orientation program during the first week of employment.

247. Plaintiff suffered damages as a direct and proximate result of Defendant's breach of the letter-contract of employment.

248. Plaintiff is entitled to compensatory damages for breach of contract in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### Declaratory Relief Under 28 U.S.C. § 2201
### (The Repayment Provision is Invalid Under the Trafficking Victims

**Protection Act, 18 U.S.C.§ 1589)**
**(Brought on behalf of the Plaintiff and the Foreign-Trained Registered Nurse Class)**

249.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 71, in paragraphs 96 through 139, in paragraphs 151 to 161, and in paragraphs 176 through 240, as if set forth fully herein.

250.    The Repayment Provision is intended to achieve purposes that are illegal under the TVPA, as it aims to procure or maintain the labor or services of Plaintiff and the Class members by threatening them that they will have to repay "expenses related to immigration, including certain filing fees, recruitment/agency fees, legal costs and temporary housing", if they leave their job. The Repayment Provision further provides that if the employee "fail[s] to repay at the time of termination, CommuniCare may pursue restitution through legal channels".

251.    These threats constitute the "threatened abuse of legal process" and/or a threat of "serious harm", in violation of 18 U.S.C. § 1589(a)(2)-(3).

252.    Defendant knowingly used such threats to exert pressure on Plaintiff and the Class members to continue working for Defendant and to prevent them from seeking employment elsewhere, telling them that they would be on the hook for immigration expenses, recruitment fees, and legal costs, unless they worked for at least 36 months. This was done with the purpose of obtaining Plaintiff's and the Class members' continued labor for Defendant.

253.    Additionally, the Repayment Provision's requirement that Plaintiff and the Class members pay Defendant's legal costs if Defendant prevails is inconsistent with the one-way fee shifting provision in the TVPA, which allows the victims of trafficking to recover their attorney's fees in civil actions brought under the TVPA.

254.     Plaintiff and the Class members have a definite and concrete dispute with Defendant concerning the enforceability of the "Repayment Provision".

255.     The dispute touches the legal relations of parties having adverse legal interests.

256.     The dispute is real and substantial.

257.     The dispute admits of specific relief through a decree of a conclusive character.

258.     The dispute involves a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

259.     Accordingly, Plaintiff, on behalf of herself and the Class, seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Repayment Provision is unenforceable.

**TENTH CAUSE OF ACTION**
**Declaratory Relief Under 28 U.S.C. § 2201**
**(The Repayment Provision is Invalid Under the Fair Labor Standards Act,**
**29 U.S.C. § 201 *et seq*. Because It Would Reduce Defendant's Wages**
**Below the Federal Minimum Wage)**
**(Brought on behalf of Plaintiff and the Foreign-Trained Registered Nurse Class)**

260.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 18, in paragraphs 57 through 95, and in paragraphs 124 through 175, as if set forth fully herein.

261.     When Plaintiff and the Class members worked for Defendant, each of them was an employee pursuant to the FLSA.

262.     Defendant was Plaintiff's and the Class's employer under the FLSA.

263.     The Repayment Provision is intended to achieve purposes that are illegal under the FLSA, as it aims to force Plaintiff and the Class members to pay Defendant

"expenses related to immigration, including certain filing fees, recruitment/agency fees, legal costs and temporary housing" --- costs that are principally for Defendant's own benefit --- and thus reduce Plaintiff's and Class members' wages in their last workweek below the federal minimum wage.

264. The Repayment Provision is thus illegal and unenforceable, under the FLSA because it would, if enforced, permit Defendant to pay Plaintiff and the Class members, its workers, wages that are below the federal minimum wage.

265. In satisfying its federal minimum wage obligations, Defendant may not seek to recover costs or damages that are primarily for its own benefit. In this case, such costs or expenses include, among other purported damages, Defendant's immigration sponsorship expenses, filing fees, recruitment fees or costs, plus legal costs that would mean attorney's fees and the costs of this suit.

266. Defendant's attempt to recoup costs and expenses that are for the benefit of Defendant violates the FLSA because in so doing, Defendant would not pay Plaintiff and the Class members wages "free and clear".

267. Because the recovery of damages such as "immigration expenses and immigration filing fees", "recruitment fees or costs", or "attorney's fees" and "costs of this suit" would reduce Plaintiff's and Class members' wages in the last week of their employment below the federal minimum wage, the enforcement of the Repayment Provision would violate the FLSA.

268. Additionally, the Repayment Provision's requirement that Plaintiff and the Class members pay Defendant's "legal costs", including attorney's fees and costs of this suit, if Defendant prevails in this case, is inconsistent with the one-way fee shifting

provision in the FLSA, which allows prevailing employees, but not employers, to recover their reasonable attorney's fees in actions brought under the FLSA.

269.     Accordingly, Plaintiff, on behalf of herself and the Class, seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Repayment Provision is unenforceable.

### ELEVENTH CAUSE OF ACTION
**Declaratory Relief Under 28 U.S.C. § 2201**
**(The Repayment Provision is Unconscionable and Unenforceable**
**Under Ohio Common Law)**
**(Brought on behalf of Plaintiff and the Foreign-Trained Registered Nurse Class)**

270.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 139 and in paragraphs 151 to 161, as if set forth fully herein.

271.     The Repayment Provision is unconscionable as a matter of Ohio law.

272.     Each of Plaintiff and the members of the Class was forced to enter into a letter-contract of employment containing the Repayment Provision on a take-it-or-leave-it basis and faced substantial harm if s/he did not sign the letter-contract, including potentially having her/his immigration sponsorship withdrawn or having her/his green card revoked, or having her/his employment rescinded, and any of such would be financially ruinous to her/him. Plaintiff and the members of the Class lacked meaningful choice about whether to enter into and sign the letter-contract.

273.     The Repayment Provision is also unreasonably favorable to Defendant. Among other things, it requires Plaintiff and the members of the Class, who are of limited financial means, to bear costs that could run into tens of thousands of dollars if they do not prevail in this action.

274. The Repayment Provision unreasonably prevents Plaintiff and the members of the Class from vindicating their own contractual and statutory rights under federal and state law, as this would require them to spend tens of thousands of dollars if they do not prevail in this action. This risk effectively chills Plaintiff and the members of the Class from raising their own claims against Defendant, and thus precludes them from vindicating their rights in this action.

275. Accordingly, Plaintiff, on behalf of herself and the Class, seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Repayment Provision is unenforceable.

### TWELFTH CAUSE OF ACTION
### Unjust Enrichment / *Quantum Meruit*

276. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 139, as if set forth fully herein.

277. Plaintiff brings this cause of action in the alternative to her claim for failure to pay for non-overtime hours under the FLSA. Defendant's policy and practice of subjecting Plaintiff pay to automatic meal break deductions even when she performed compensable work resulted in Plaintiff not being fully paid for the actual work, on a non-overtime basis, she performed during meal breaks. Further, Defendant's policy and practice of allowing, suffering or requiring Plaintiff to come in and work earlier than the start of her work-shift, and to stay behind and continue working after the end of her work-shift, and not paying for these off-the-clock work, resulted in Plaintiff not being fully paid for the actual work she performed.

278. Plaintiff was not paid wages for all of the time she worked for Defendant.

279.    Plaintiff conferred a benefit upon the Defendant by performing work for which she was not fully compensated.

280.    Defendant knew and appreciated that it was receiving the benefit of the uncompensated work performed by the Plaintiff.

281.    Defendant retained the benefit of the uncompensated work performed by the Plaintiff under circumstances which render it inequitable and unjust for Defendant to retain such benefits without paying for their value.

282.    Defendant was unjustly enriched by requiring the Plaintiff to work without payment for all hours worked.

283.    Plaintiff rendered valuable services to the Defendant.

284.    The services were accepted, used, and enjoyed by the Defendant.

285.    The services were rendered under such circumstances that reasonably notified the Defendant that the Plaintiff, in performing such services, expected to be paid by the Defendant.

286.    Accordingly, Defendant has been unjustly enriched, and Plaintiff seeks to be entitled to the value, *quantum meruit*, of the services rendered by her to the Defendant.

## DEMAND FOR JURY TRIAL

287.    Plaintiff is entitled to and hereby demands a jury trial in this matter on all issues of fact raised by the Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, and all those similarly situated, collectively pray that this Honorable Court:

A.      Issue an Order permitting this litigation to proceed as a collective action, and certifying the class pursuant to Fed. R. Civ. R. 23(a) and (b)(3);

B.      Order prompt notice, pursuant to 29 U.S.C. § 216(b), to all members of the FLSA Collective that this litigation is pending and that they have the right to "opt in" to this litigation;

C.      Award Plaintiff and the FLSA Collective she represents actual damages for unpaid overtime compensation and minimum wages;

D.      Award Plaintiff and the FLSA Collective she represents liquidated damages equal in amount to unpaid overtime wages found due to Plaintiff and the Collective;

E.      Designate Plaintiff as representative of the Collective/Class and designate Plaintiff's counsel as counsel for the Collective/Class;

F.      Order Defendant to pay Plaintiff and the Class members compensatory damages, including emotional distress damages, and punitive damages for violation of the TVPA;

G.      Order Defendant to pay Plaintiff and the Class members treble compensatory and punitive damages for violation of RICO;

H.      Declare that the "Repayment Provision" is unenforceable under the TVPA or the FLSA or Ohio law;

I.      Award Plaintiff and the Class she represents reasonable attorney's fees, costs of suit and disbursements, as allowed by FLSA, the TVPA and by RICO;

J.       Award Plaintiff and the Class she represents pre- and post-judgment interest at the statutory rate;

K.     Award Plaintiff and the Class she represents further and additional relief as this Court deems just and proper.

Dated: February 17, 2023.

Respectfully submitted,

THE LAW FIRM OF SHIHAB & ASSOCIATES, CO., LPA

*/s/ Ghassan M. Shihab*
By:     GHASSAN "GUS" M. SHIHAB
        OH Bar No. 0061098
        65 East State Street, Suite 1550
        Columbus, OH 43215
        Tel. No. 877-479-4872
        Email: gus@shihab.law


LAW OFFICE OF FELIX VINLUAN


By:     FELIX Q. VINLUAN *
        NY Bar No. 2880557
        6910 Roosevelt Avenue, 2nd Floor
        Woodside, NY 11377
        Tel. No. 718-478-4488
        Email: fqvinluan@yahoo.com


THE LAW OFFICES OF MAGEN E. KELLAM, P.A.


By:     MAGEN E. KELLAM *
        FL Bar No. 0848611
        808 Wiggins Pass Road, Suite 204
        Naples, FL 34110
        Tel. No. 239-260-4622
        Email: magenk@kellamlegal.com

* *Pro hac vice* motion forthcoming

*Attorneys for Plaintiff and the Putative Class*